Ludlam *v.* Ludlam.

[DUTCHESS GENERAL TERM, May 14, 1860. *Lott, Emott* and *Brown,* Justices.]

---

ANNA LUDLAM *vs.* MAXIMO M. LUDLAM and others.

The statutes of the English parliament, relative to the children of British subjects, born abroad, were in force in the province of New York down to the time of the American revolution, and were continued by the constitution of the state of New York, adopted in 1777. But in 1778 it was enacted that after the first day of May then next, none of the statutes of Great Britain should be considered laws of this state. The effect of this, and of the subsequent legislation of congress upon the subject of naturalization, has been to leave the condition of all the children of American citizens born abroad between the years 1802 and 1855 exclusively to the decision of the dormant principles of the common law.

By the common law, when a subject is traveling or sojourning abroad, either on the public business, or on lawful occasion of his own, with the express or implied license and sanction of the sovereign and with the intention of returning, as he continues under the protection of the sovereign power, so he retains the privileges and continues under the obligations, of his allegiance, and his children, though born in a foreign country, are not born under foreign allegiance, and are an exception to the rule which makes the place of birth the test of citizenship.

The universal maxim of the common law being *partus sequitur patrem*, it is sufficient for the application of this doctrine that the father should be a subject, lawfully and without breach of his allegiance beyond sea, no matter what may be the condition of the mother.

The children of subjects thus sojourning or traveling beyond the seas were recognized as denizens, under English law, when and as fast as the occasion and instances of foreign travel and temporary residence multiplied, and the question was presented to the courts; and this was by the development and application of the doctrines of the common law, and not by mere force of statutes.

The statute of Edward 3, *De natis ultra mare*, was not intended to abrogate,

Ludlam *v.* Ludlam.

nor is it to be understood as abrogating, an existing rule of law and introducing a new rule by the will of the legislature, but was declaratory in its nature ; or at least, furnishes no evidence that the rule of the common law was other than that contained in its provisions, but rather the contrary.

In accordance with the above principles, *Held* that the defendant, the son of an American citizen by an alien mother, born in a foreign country while his father was temporarily resident there, was a citizen of the United States, and entitled to inherit here. LOTT, J. dissented.

*Held also,* that the greater or less duration of the father's residence abroad was not material; so long as it was, in intention and in fact, temporary, and not perpetual.

APPEAL by the defendant Maximo M. Ludlam, from a judgment entered at a special term, after a trial at the circuit, before Justice LOTT, without a jury.

*C. J. De Witt,* for the appellant.

*R. C. Underhill,* for the plaintiff.

EMOTT, J. The plaintiff brought this action against Silas and Edward Ludlam and William H. Hewitt, who are the executors of her father, Richard L. Ludlam, and against Maximo Ludlam, who is her only surviving brother, to compel the former to account for and pay over to her, to the exclusion of the latter, all the proceeds of the sale of certain lands in the county of Queens and the city of New York. These lands were owned by Thomas R. Ludlam, a brother of Richard R. Ludlam, the plaintiff's father. Richard R. Ludlam died in 1838, and Thomas R. Ludlam died in 1847, intestate, and thus the children of Richard R. Ludlam were among the heirs at law of the latter, and one-sixth of his lands descended to them as representing their father. The defendant Silas Ludlam was appointed by this court the special guardian of both the plaintiff and the defendant Maximo M. Ludlam, for the purpose of joining in a sale of these lands, and one-sixth of the proceeds was paid over to the executors of Richard L. Ludlam, who are the testamentary guardians of both his children. These children have now both attained lawful age, and the plaintiff claims the whole of the

proceeds which were thus received by the executors of her father, to the exclusion of her brother Maximo M. Ludlam, on tho ground that he was an alien at the time of the descent, and, therefore could not inherit to his uncle. The judge before whom the cause was tried decided that Maximo M. Ludlam was an alien in 1847, when the descent was cast by his uncle's death, and therefore the plaintiff was entitled to the whole proceeds of the lands in question; and this is the only question in the case.

Richard L. Ludlam, the father of these parties, was a citizen of this country, born here in 1804. In 1822 he went to Peru to seek employment, and better his condition. He became a clerk in a mercantile house in Lima, and in 1828 married a woman who was a native of Chili, but then a resident of Peru. Maximo M. Ludlam is her son, and was born in Lima in 1831. In 1828 Richard L. Ludlam went into business on his own account, in Lima, and continued to reside there until April, 1837, when he left South America and came back to reside in this country with his wife and children. They had other children born in Peru besides Maximo, but they subsequently died, in this country.

: The plaintiff was born after their arrival in New York, in December, 1837. The mother of the plaintiff was examined as a witness on the trial of this cause, and testified to the facts just stated, and also that they left Lima because her husband was sick, and was advised to leave that country, and because he wished to educate his children here. She also stated that after the birth of their children in Peru, he always intended to return to this country, and expressed that intention. Silas Ludlam was also sworn at the trial, but his testimony, except the proof of some undisputed facts, was chiefly of a negative character; that communication between this country and Peru was at that time very infrequent if not difficult; that but little correspondence took place between his brother and the family at home, and that they were not aware of any purpose on his part to return, until he reached the United

Ludlam *v.* Ludlam.

States with his family. It may be added that the wife of Richard Ludlam has never been naturalized in this country.

Upon this evidence the judge found that Richard L. Ludlam in 1822 voluntarily expatriated himself from the United States for the purpose of becoming a permanent resident of Lima, in Peru, and of establishing his permanent domicil there, and in a few months thereafter did become such permanent resident, and establish his permanent domicil in Lima. If the word "*expatriated*" is to be understood here in its proper sense, I should be unable to agree to this part of the decision, as a question of fact. To expatriate is to leave one's country, and renounce allegiance to it, with the purpose of making a home and becoming a citizen in another country. It includes more than a change of domicil, and it is hardly an accurate use of terms to say that a man has expatriated himself with the design of changing his residence. He might more correctly be said in a given case to change his domicil with a view to expatriation. But I do not discover, in the evidence in this case, any thing to show that Richard Ludlam ever intended to expatriate himself, to renounce his American citizenship and assume allegiance to a foreign power, while it will be observed that he is not found or decided to have actually done so. He neither became, nor declared any intention of becoming a Peruvian citizen, nor did he in any way deny or renounce his American citizenship. He left his native country in the search of employment and fortune. He found employment and at length established himself in business. He married and had children, and after that he looked forward constantly to a return to the United States. So at least I read the evidence. There is no doubt that he acquired a domicil in Lima; that he went there and remained there, with no fixed purpose of a return at any definite time. That was his residence until he was probably driven away by the failure of his health. Still that he was an American citizen and an alien in Peru, although resident there as a merchant and for the purpose of trade, and that when he returned to this country he was as completely vested

with all the rights of citizenship as if he had never left it, is, I think, exceedingly plain. Maximo M. Ludlam is therefore the son of an American citizen by an alien mother, born in a foreign country while his father was temporarily resident there. I say born while his father was temporarily resident there; as implying that this residence was not perpetual or permanent, either in fact or in intention. I see no reason to doubt that Richard Ludlam intended to return to America before he died, although he probably did not intend to return before many years, and probably not as soon as he did. But the actual or intended length of his residence in Peru is not material. If he made his domicil in that country, as he admittedly did, it is unimportant, for the present question, whether that domicil continued for one year or ten. He was not a traveler but a resident, and yet he was not a citizen of Peru, nor did he intend to become so, but continued all the while a citizen of the United States.

The counsel for the plaintiff is right in supposing that there is no *statute* of the United States which will reach the case. Congress possesses, under the constitution, express and exclusive power to establish a uniform rule of naturalization, and probably, as incidental thereto, to declare, if they see fit to do so, what shall make a man a citizen or an alien. This power has been repeatedly exercised. The first act for this purpose was passed March 26, 1790, which was succeeded and repealed by a second passed January 29th, 1795. By both these statutes it was enacted that all children of citizens, born out of the limits of the United States, should be considered citizens. If either of these acts were in force it would probably determine the present question. But the act of 1795 repealed the act of 1790, as I have stated, and the act of 1795 was itself repealed by a statute passed April 14th, 1802, which only provided that the children of "persons who now are or have been citizens, though born out of the jurisdiction of the United States, shall be considered citizens." Richard Ludlam, the father of the defendant, was not born until 1804,

Ludlam *v.* Ludlam.

and hence did not come within the operation of this statute. This continued to be the only act of congress upon this subject until 1855, when an act was passed which will avoid such questions in future cases.    But as this descent was cast in 1847, if Maximo Ludlam was then an alien the lands passed at once to the plaintiff, and her title cannot be divested by the character given to her brother by subsequent legislation.

We are necessarily driven to the doctrines of the common law to determine the condition of a person born under such circumstances.    For the question must be decided by some rule of law.    The terms alien and citizen are legal terms, and in cases in which their proper application is not determined by positive legislation, we must get it from the system of law which prevails in the country in which the question arises, antecedent to or independent of legislative action, if that body of law contain any rule upon the subject.    Perhaps we might go to general public law, or the law of nations, if it do not. But we are not left without any rule upon the subject because congress has not exercised the power which is given to them to make one.

There are no cases in the courts of this country in which a question like this has been decided independent of legislative action, or the rule given by common law in such cases laid down.    The case of *Young* v. *Peck,* (21 *Wend.* 389 ; *S. C.* 26 *id.* 613,) was decided in the supreme court upon the statute of 1802, and in the court of errors, either upon the same ground or upon the effect of the declaration of independence and the treaty of peace, upon persons domiciled and remaining here after the revolutionary war.    It is true the chancellor expresses an opinion that the statute of 1802 was intended to change the common law rule, by which, he says, the children of a citizen born abroad were aliens.    But that point was not presented for decision, and a contrary opinion is intimated by the chief justice when the case was in the supreme court, both opinions being merely obiter.    The cases in the United States courts (*see* 2 *Cranch,* 64, *and* 7 *Wheat.* 383) have

presented questions involving the right of expatriation and change of allegiance, and so widely distinguishable from the present. In *Lynch* v. *Clarke*, (1 *Sand. Ch. R.* 659,) Vice Chancellor Sandford expresses the conviction that the children of our citizens born abroad were citizens by force of the common law, under which he supposes that children born abroad of English parents were subjects of the crown and not aliens. In his opinion will be found a reference to all the American decisions, in none of which, however, is the point distinctly passed upon.

In England, while the right to citizenship of children born under such circumstances has been constantly asserted, it has never been expressly decided whether that right was due to the common law or to positive statutes. As early as it became a frequent or a familiar thing for Englishmen to leave the kingdom with their families, either for purposes of travel or trade, we find parliamentary action to remove all difficulty or doubt in the case of children who might be born to them abroad. The earliest parliamentary act is what is known as the statute *de natis ultra mare*, passed in the 25th year of the reign of Edward 3d, A. D. 1351. The existence of this early statute has unquestionably prevented a clear exposition by subsequent judges of the principles of the common law upon this question. But it is material to ascertain whether the " *statutum de natis ultra mare*," like an ordinary statute of the present day, introduced into the law a new rule, or whether it was rather a declaration of the opinion of the parliament upon the law as it then was, more nearly analogous to what in modern times is called a declaratory act. It will be seen that this is a question of no small importance in the disposition of the present case, in consequence of the peculiar condition of American legislation upon the subject.

The reign of Edward 3d is one of the most important eras in English history, on many accounts. It was attended with some special circumstances which may have given occasion to questions like the present. It was the period of the com-

mencement of the French wars which led to the removal and settlement of many English subjects in places in France, which by the changes of war and of treaty were at times under English and at others under French domination. At the same time the English nation was assuming a more influential position among European powers, and the intercourse among all nations was growing more frequent. Instances of leaving the kingdom for the purpose of commercial, military or public intercourse with other nations, must have been becoming more common, and questions as to the rights and privileges of children born abroad to subjects thus absent from the realm, were more likely to be agitated. It may also be noted that Philippa, the queen of Edward 3d, was by birth an alien to the realm, and that a large portion of the life of Edward the black prince was spent abroad. His son, who afterwards came to the throne as Richard 2d, was known, from the place of his birth, as Richard of Bordeaux.

When we find that parliament interposed to settle a question which had arisen or might arise out of such circumstances as have been alluded to, we are not to presume, as we might in considering a statute of the present day, that they intended or were understood to make the law, and to introduce a new rule. The constitution of the English legislature at that day is to some extent a matter of dispute, and its functions, or the manner and extent of their exercise as to legislation, was certainly much more limited than they afterwards became. The organization and manner of session of the commons as a separate or constituent part of the legislature was as yet ill defined. There is no record of a speaker of the house being chosen, until at least as late as the fiftieth year of Edward 3d, and probably still later. The parliament was first and usually called together to grant taxes, and out of the demand for these, and the power to impose conditions upon granting them, grew much of its authority. The commons asserted the right to petition for the redress of grievances, and their petition, formally assented to by the king and the coun-

cil, was in many cases the form of parliamentary action.  Thus the statute of treasons, passed in the same year with the law we are considering, and which is to this day one of the funda-mental statutes in English criminal law, is founded upon the petition of the commons.  The commons pray that " whereas the king's justices adjudge persons to be traitors for various matters not known to be treason, it would please the king by his council and the great and wise men, to declare what shall be treasons in this present parliament."  The answer to this petition contains the existing statute.  It was considered no light matter to make a statute which should introduce a new rule of general law, to be forever incorporated with the law of England.  Mr. Hallam says that it was a common answer to the petitions of the commons, that they could not be granted without making a new law.  And this reluctance led to the distinction between statutes, which were perpetual, and ordi-nances, which were temporary in their nature.  It seems also that the assembly of the different estates of the realm was not looked upon merely as such a body as it came to be after-wards, acting only by and through the forms of legislation. It was also a high court in which injustice was to be punished, and grievances redressed, sometimes upon the complaints of individual suitors, but in many, probably in most instances, upon the petitions and complaints of the representatives of the commons of England in behalf of their whole body.  The ordinary courts of justice were neither sufficiently strong to protect the weak against the powerful, nor sufficiently known and respected to make their decisions, as yet, the authorita-tive expositions of the law which they afterwards grew to be. In the reign of Edward 2d, it was ordained that the king should hold a parliament once, and if necessary twice, every year, that the pleas which have been delayed, and those wherein the justices have differed, may be brought to a close. And thus in the present statute it appears that the question which it was passed to settle, and which was a question as to what the law was, had been before parliament in a previous

year of the same reign. I am not aware that legal historians or antiquaries have considered the exercise of such quasi judicial powers as these by the parliament, to have been confined to the council, or to have been analogous to the present appellate jurisdiction of the house of lords, however on the subsequent growth of the constitution it may have terminated in an appellate jurisdiction confined to that body exclusively.

The statute *de natis ultra mare* begins by reciting that "because some people be in doubt if the children born in the parts beyond the sea out of the ligeance of England, should be able to demand any inheritance within the same ligeance or not, whereof a petition was put in the parliament late holden at Westminster the 19th year of this reign, &c., and was not at the time wholly assented, our lord the king willing that all doubts and ambiguities should be put away, and the law in this case declared and put in a certainty, hath charged the prelates, earls, barons and other wise men of his council assembled in this parliament to deliberate on this point." It then declares that these, all of one accord have said that it is and always has been the law of the crown that the children of the king, wherever they may have been born, may inherit. After this, the statute proceeds to declare certain persons to be denizens, who are named, and who we may presume were all the persons concerning whose denizenship a question had been brought to the notice of the parliament. Then follows the part of the statute to which the present question refers, which is to the effect that the barons, &c., and the commons assembled, "be of one mind accorded that all the children inheritors which from henceforth shall be born without the ligeance of the king, whose fathers and mothers at the time of their birth be at the faith and ligeance of the king of England, shall have and enjoy their inheritances, &c. So always that the mothers of such children do pass the sea by the license and wills of their husbands." It will be observed that the natural import of this language is that both the parents must be subjects, to make the issue inheritable. It was not until

far more recent times that any express statutory sanction was given to a more lenient rule, for it was not until the statutes of 7 Anne, 10 Anne, 4 George 2, and 13 George 3, that any act of parliament declared that the child of an Englishman, born abroad, should inherit, although the mother was an alien.    There is another statute, passed in the 42d year of the reign of Edward 3, which may be cited as to some extent explanatory of that which we are considering.    The act of the 42d Edward 3, is to this effect : on the petition " that children born beyond sea in the seignories of Calais, Guienne and Gascony, and elsewhere in the lands and seignories that belong to our lord the king beyond sea, should be inheritable," &c., " it is agreed and assented that the common law and the statute on this point should be kept and observed."    The meaning obviously is to assert their denizenship, and this is referred not wholly to statute, but to both common law and statute.    The act of 25 Edward 3 is expressly declaratory as to the children of the king, and this has been used as an argument, as for instance by Barrington in his comment, (*Obs. on Stat.* 209,) that in the case of a common subject the law was apprehended to be otherwise.    There is, of course, a certain degree of force in the argument, but I think it is countervailed by the whole form and language of the act, and by the reasoning of the subsequent decisions, as well as by the course of legislation.    The statute recites that the question as to the children of subjects born under such circumstances had been discussed but not decided, and was in doubt.    The law was therefore not against their denizenship, and we may decide the question upon principles, and may call to our assistance, to ascertain these principles, the subsequent as well as prior cases in the courts.

The year books, which contain the earliest reported cases in the English courts, begin with the reign of Edward the 2d, and there is nothing before that, except a few scattering cases in the time of Henry the 3d and Edward the 1st, which are found in *Fitzherbert's Abridgment.*

Ludlam *v.* Ludlam.

The earliest case in which a question like the present oc-curs, is given in *Brooke's Abr., Denizen,* 6. The writer says, "Nota per Hussey, Ch. J.: If a man be born beyond sea, whose father and mother are English, he should be inherita-ble before the statute, but the statute makes this clear." The date given for this is the first year of the reign of Richard 3d. The same *Brooke's Abr.,* in the same title, § 21, says: "If an Englishman pass the sea and marry an alien woman, by this the wife is of the king's allegiance, and the issue will in-herit," for which the author refers to the *Abridgment of Assizes.* In *Collingwood* v. *Pace* (1 *Ventr.* 422) Lord Hale asserts the converse of this proposition, that if an English woman go beyond sea and marry an alien, the children are aliens, for the wife was *sub potestate viri.* In the first of these statements from *Brooke's Abridgment,* the proposition given is cited as laid down by the court to the same effect as declared by the statute. The second goes farther than the letter of the statute, and depends upon the settled maxim of the common law, and of all free states where that law prevails, that the offspring follow the condition of the father and not the mother, *partus sequitur patrem.* In *Rex v. Eaton (Lit-tleton's Rep.* 23, 26, 27) will be found a full and well reasoned discussion of this subject in the argument and decision of the case. It was insisted there that allegiance was not merely local; that an alien was one born not only out of the king-dom, but under a foreign obedience. Cases were put and cited and distinguished of a man traveling, which, says the report, the common law did not forbid, and going out of the realm into the dominions of an alien friend or into those of an alien enemy, and with or without the king's consent, and of his children born either while such consent continued, or after it was revoked and he recalled. The maxim *partus se-quitur patrem* was cited, and its application to cases arising under villenage noticed. The case in hand was of an English merchant who had gone into Poland and married a woman there; and the question was whether their child was an alien.

It was held that he was not, for which Yelverton, J. gave for reason that the father was a merchant and went abroad by license, and the son took the father's condition. Some of the other judges put the case upon the statute of Edward 3d, and held that the words ". whose father and mother" in that statute should be read "father *or* mother." I confess this seems to me much more doubtful law than the other doctrine. The construction is a violent one, and the doctrine of the case is more easily sustained upon the principles of the common law, and as if they had been declared by the statute. If the statute had not been passed, the common law, as foreign travel and commercial pursuits increased, would have asserted the rule which the statute declared, but declared in respect only to children whose fathers and mothers both were English. The common law, adhering also to the doctrine that the condition of the father determined that of the offspring, would reach cases which were not within the letter of the act. This case in Littleton was decided in 2 Charles 1st. A case is cited there which will be found in *Cro. Eliz.* 3, that when baron and feme English go beyond sea without license, or tarry there after the time limited by the license, the issue is an alien and not inheritable. *Bacon* v. *Bacon* (*Cro. Chas.* 601) is very similar to the case cited from Littleton. Thomas Bacon went abroad to carry on trade, and married the daughter of another English merchant, resident abroad. Their child, born abroad, was held to be a denizen. Brampton, Berkley and Croke said that the father being a merchant and residing abroad for purposes of trade, his child should be a denizen, and that even though the mother had been an alien, for the children follow the father's condition. Brampton said this was by the common law; but Berkley by the statute of Edward 3d; and Croke seems rather to have held with Brampton. The case reported in Littleton was cited. The case of *Collingwood* v. *Pays* or *Pace* is also reported in 1 *Siderf.* 193. The point decided in the exchequer chamber in this case was that when an alien had children denizens, they could

Ludlam *v.* Ludlam.

inherit to one another. The reporter notes what was said, apparently in argument, about the statute of Edward 3d, that although this names husband and wife, still it suffices that the husband should be a subject though the wife was an alien, for the wife was under the power of the husband, and so under the same allegiance as he. A rule, it may be observed, which does not make allegiance altogether a question of place. He proceeds that it is not sufficient where the wife only is a subject; and he refers to the cases in Littleton and Croke, as deciding that the children will inherit as before if the father be a subject, though the mother be an alien. Then the report proceeds to give the rule that the children will not inherit, although both parents are subjects, if they are born abroad after the license to the parents to remain abroad is determined, which again does not go upon the ground of a merely *local* allegiance. Finally, the reporter adds " quere of persons not merchants who go beyond sea without license, and have children, if their children inherit." A question which was not to be solved by the letter of the statutes, which said nothing either of such merchants or of license by the king to leave the realm. These principles will be found collected in *Com. Dig. Alien B,* but no opinion is expressed by the author whether the statute of Edward 3d was declaratory of the common law or first established the rule. In *Bac. Abr. Alien A,* the rule is given that if an English merchant go beyond sea and take an alien wife, the issue shall inherit him. In *Calvin's case,* or the case of the post nati, (7 *Co. R.* 1 ; 2 *State Trials,* 560,) the subject of allegiance was very largely considered. The question upon which that case turned was whether a man born in Scotland after the accession of James to the crown of England was an alien or a denizen. It was determined in favor of his denization ; and although from the existence of the statute of Edward 3d, which seemed to reach nearly all cases of possible inconvenience, and the comparative infrequency of journeys or residence abroad, the principles of the common law were not disarmed in their application to instances of children of Eng-

lishmen resident in foreign countries for trade &c., yet the doctrine of the nature and essence of allegiance was thoroughly discussed, and some cases considered which must go upon the principles asserted by some of the judges in *Bacon* v. *Bacon* and *Rex* v. *Eaton.* Thus the case of an ambassador was put, and it was agreed that his children would be denizens though born abroad. When foreign travel became more frequent it would have been seen and no doubt declared that absence for trade or travel was as lawful as if it were upon the king's business. It is true that the doctrine of allegiance, as consequent or dependent upon the place of birth, was always strongly insisted upon by English courts and lawyers in favor of the English crown, and a right to the allegiance of every person born within the realm was sometimes asserted, no matter how he came to live there, or who were his parents. But the bearing or limitation of this doctrine in international law was never considered, and I think it is plain, from what has been cited, that the converse proposition was never conceded, that the place of birth would make the children of an English subject free from his allegiance. This depended upon the circumstances and the condition of his absence. It will be found that the doctrine of allegiance from the mere place of birth has met with very various treatment in the tribunals of every country, according to the aspect in which it has been presented. It has been strenuously insisted upon when by birth the person in question would be bound to the country of the tribunal, while no country has ever been as ready to assert it when it would work against itself. It can hardly be said to be settled as a universal rule; certainly not without exceptions. I cannot doubt that the principles of the common law would protect the children of British subjects born abroad during a temporary absence of the parents, and assert their denizenship and allegiance to the British crown. The statutes which were passed, from time to time, rendered the elucidation and application of these principles in most cases unnecessary. Jenkins, in his *Centuries,* page 3, case 2, says expressly, that

Ludlam v. Ludlam.

the children of a merchant trading in a foreign country, by an alien mother and born there, shall be heirs to the father, for the business of a merchant requires a long abode abroad if he will not trust his fortune to factors; and this he seems to put not upon the statute but the principles of the common law. There are one or two more recent cases which require notice. One of these is *Doe dem. Durroure* v. *Jones*, (4 *T. R.* 300, 308.) The point there ruled was that the son of an alien father and an English mother, born out of the king's dominion, could not inherit either at common law or under the statutes. This is a very different case from the one in hand, by all the effect of the application of the rule *partus sequitur patrem.* In reading the opinion of the judges in this case the observation which has been already made, that the existence of the various and successive acts of parliament on this subject presented a clear and direct decision of the point by the common law alone in any of the earlier cases, should not be forgotten. Lord Kenyon observes, in his opinion, that the character of a natural born subject, anterior to the statute, was incident to birth within the allegiance of the king only. This remark, in its bearing upon the present question, should be qualified by the addition that as travel and foreign residence became more frequent and necessary, a temporary abode in a foreign country was regarded by the law as not being a departure from the legiance of the sovereign, or as constituting an exception to the rule. The other judges evidently sanctioned the doctrine that the denizenship of the son of an English merchant by an alien mother must be referred to the condition of the father, and his lawful and temporary abode in a foreign country, and not to a violent construction of the statute of Edward 3d, changing "and" into "or." The case of *Doe dem. Thomas* v. *Acklam* (2 *Barn. & Cress.* 779) does not distinguish between the effect of the statute and the common law. It contains, however, a valuable discussion of the subject in the argument at the bar by Tindall & Parke, who were of counsel. Singularly enough, their arguments are cited by

the late Vice Chancellor Sandford, in *Lynch* v. *Clarke*, (1 *Sandf. Ch. Rep.* 659, 678,) as if they were opinions delivered from the bench to which both these distinguished counsel were afterwards elevated. Sir Charles Abbott, afterwards Lord Tenterden, was then chief justice, and delivered the only opinion in the case.

Sir William Blackstone, in his commentaries, intimates the opinion that at common law a man born out of the realm, of whatever parents, was an alien. He seems to consider the exceptions which must, he admits, be made to this rule, as resulting from the statutes. The distinguished commentator, like the English judges, was not driven to decide the question, as we are, without the aid of statutes. If he had been I am confident he would have arrived at a different conclusion. Reeve, in his History of English Law, (vol. 2, p. 400,) says that the statute of Edward 3d was made to remove some doubt which was entertained about the denization of children born of English parents out of the kingdom; and Chancellor Kent seems to have entertained the same opinion. (2 *Kent's Com.* 49.)

The statutes of the English parliament, to which I have referred, were in force in the province of New York down to the revolution, and were continued by the constitution of the state of New York, adopted in 1777. But in 1788 (2 *Greenl. Laws N. Y.* 116) it was enacted that after the 1st of May next, none of the statutes of Great Britain should be considered laws of this state. The effect of this, and of the subsequent legislation of congress upon the subject of naturalization, has been to leave the condition of all the children of American citizens born abroad, between 1802 and 1855, exclusively to the decision of what Chancellor Kent. (2 *Kent's Com.* 53,) calls the dormant and doubtful principles of the common law.

Dormant these principles certainly have been during the long period, in which the need of them has been supplied by statutory regulations, but I think they are not altogether doubtful.

I conceive that 1st. By the common law when a subject is traveling or sojourning abroad, either on the public business, or on lawful occasion of his own, with the express or implied license and sanction of the sovereign, and with the intention of returning, as he continues under the protection of the sovereign power, so he retains the privileges and continues under the obligations of his allegiance, and his children, though born in a foreign country, are not born under foreign allegiance, and are an exception to the rule which makes the place of birth the test of citizenship. 2d. That as the universal maxim of the common law is *partus sequitur patrem,* it is sufficient for the application of the doctrine just stated, that the father should be a subject, lawfully and without breach of his allegiance beyond sea, no matter what may be the condition of the mother. 3d. That the children of subjects thus sojourning or traveling beyond the seas were recognized as denizens under English law, when and as fast as the occasion and instances of foreign travel and temporary residence multiplied, and the question was presented to the courts, and this was by the development and application of the doctrines of the common law, and not by mere force of statutes. 4th. That the statute of Edward 3 was not intended, nor is it to be understood as abrogating an existing rule of law, and introducing a new rule by the will of the legislature, but was declaratory in its nature, or at least furnishes no evidence that the rule of the common law was other than that contained in its provisions, but rather the contrary. The denization of the children of a British father by a foreign mother, before the statute of Anne, must be attributed to the common law, rather than to a strained construction of the statute of Edward, and is an important indication of the origin of the whole doctrine on this subject.

It may be objected that the country in which such children are born, might claim them as citizens by reason of their birth. I apprehend not, when the residence of the parents was merely temporary, and when the children were removed before their

Ludlam *v.* Ludlam.

majority. Cases might perhaps be supposed when the children would be, to some extent under both allegiances, or at least might be entitled or bound to elect between the two. But when, as in this case, the parent returns to his native country, which he had never abjured, nor permanently forsaken, bringing the child while still an infant, that country cannot be called upon to relinquish his allegiance, or that of his children, on account of any possible conflict with the country of his temporary abode.

As I have already said, the greater or less duration of that abode does not seem material, so long as it is, in intention and in fact, temporary and not perpetual. I can discover no rule which would denationalize this defendant, which would not be equally operative if his father's residence in Peru had been but for one year or two, provided it had been an actual and legal domicil.

Although a domicil, it was that of a merchant temporarily resident abroad, intending at some future time, although at a time not defined, to return to the United States, not expatriated, and who had never ceased to be a citizen of his native country. Under these circumstances I think his son, though born in Lima, is a citizen of the United States, and entitled to inherit here. My conclusion therefore is that the judge before whom this cause was tried erroneously held to the contrary, and that his judgment must be reversed, and a new trial ordered.

BROWN, J. concurred.

LOTT, J. dissented.

New trial granted.

[DUTCHESS GENERAL TERM, May 14, 1860. *Lott, Emott* and *Brown,* Justices.]