## Case No. 11,719.

### Ex parte REYNOLDS.

[5 Dill. 394; [1] 18 Alb. Law J. 8.]

Circuit Court, W. D. Arkansas.  1879.

INDIANS AND THEIR OFFSPRING—CRIMINAL JURIS-
DICTION OF THE FEDERAL COURTS OVER IN-
DIANS—WHO IS AN INDIAN—HABEAS CORPUS.

1. Indians who maintain their tribal relations
are the subjects of independent governments,
and, as such, not in the jurisdiction of the
United States, within the meaning of the con-
stitution and laws of the United States, because
the Indian nations have always been regarded
as distinct political communities, between which
and our government certain international rela-
tions were to be maintained. These relations
are established by treaties to the same extent
as with foreign powers. They are treated as
sovereign communities, possessing and exercis-
ing the right of free deliberation and action, but,
in consideration of protection, owing a qualified
subjection to the United States.

2. When the members of a tribe of Indians
scatter themselves among the citizens of the
United States, and live among the people of the
United States, they are merged in the mass of
our people, owing complete allegiance to the
government of the United States, and, equally
with the citizens thereof, subject to the juris-
diction of the courts thereof.

[Cited in Ex parte Kenyon, Case No. 7,720;
Elk v. Wilkins, 112 U. S. 108, 120, 5 Sup. Ct.
49, 55.]

3. The condition of the offspring of a union
between a citizen of the United States and one
who is not a citizen, e. g., an Indian living with
his people in a tribal relation, is that of the
father. The status of the child in such case
is that of the father. The rule of the common
law and of the Roman civil law, as well as of
the law of nations, prevails in determining the
status of the child in such case.

[Quoted in United States v. Ward, 42 Fed.
322.]

Application for habeas corpus for the dis-
charge of James E. Reynolds, committed for
murder.

W. H. Clayton, U. S. Dist. Atty., for the
government.

PARKER, District Judge. In this case
the petitioner asks to be discharged on the
ground that the evidence taken before the
United States commissioner shows that this
court has no jurisdiction. In order to make
jurisdiction complete in this court, the court
must have the right under the law to take
cognizance of the offence. Such right, as far
as this court is concerned, depends upon
three things: First, the nature of the of-
fence; second, the status as to nationality of
the person committing it and the person
against whom it is committed; and, third,
the place where it is committed. This is so,
because the criminal jurisdiction of the
courts of the United States is limited, and is
generally dependent upon the nature of the
offence and the place where the same is
committed, and the jurisdiction of this court
is dependent upon all three of the requisites
set out above. In order to give this court

[1] [Reported by Hon. John F. Dillon, Circuit
Judge, and here reprinted by permission.]

jurisdiction of the crime of murder, of which
the defendant stands charged, it must appear
that the crime was committed in the Indian
country, and that the person who commit-
ted it is not one of those persons known as
an Indian, or, if he is an Indian, that the
person upon whom the crime was commit-
ted was not an Indian. If the person char-
ged and the person upon whom the crime
was committed are both Indians, under sec-
tion 2446 of the intercourse law (Rev. St.
1873, p. 376), this court has no jurisdiction,
because, by the terms of said section, the
general laws of the United States defining
crimes and providing for their punishment
do not extend to "offences committed by one
Indian upon the person or property of an-
other Indian"; but the same are left by the
laws of the United States to be dealt with
by the Indian authorities.

It is claimed in this case that both Reyn-
olds, the defendant, and Puryear, the man
who was killed, were Indians. If so, that
ends the power of this court to hold the de-
fendant in custody. It is not contended that
Reynolds and Puryear are Indians by birth
—that is, that they belong to the race gen-
erally, or to the family of Indians; but it is
claimed that they are Indians in law, by rea-
son of their marriage to persons who do be-
long to the family of Indians—who belong to
the Choctaw Nation or Tribe of Indians.

It is provided by the 38th article of the
treaty of 1866 [14 Stat. 779] between the
Choctaw Nation and the government of the
United States, that "every white person who,
having married a Choctaw or Chickasaw,
resides in the said Choctaw or Chickasaw
Nation, or who has been adopted by the leg-
islative authorities, is to be deemed a mem-
ber of said Nation, and shall be subject to
the laws of the Choctaw and Chickasaw
Nations according to his domicile, and to
prosecution and trial before their tribunals,
and to punishment according to their laws,
in all respects as though he was a native
Choctaw or Chickasaw." This article of the
treaty permits a citizen of the United States
to place himself beyond the jurisdiction of
the laws of the United States by joining
himself in marriage to an Indian who is of
the Choctaw or Chickasaw Tribe, and by
residence in their country. Before a citizen
—that is, one of the sovereign people, a
constituent member of the sovereignty—can
expatriate himself under this section of the
treaty, and place himself beyond the juris-
diction of the courts of the United States,
there must be a concurrence of certain
things, to-wit, marriage to a Choctaw or
Chickasaw, and residence in the country of
one or the other of these tribes. It is con-
tended in this case that both Reynolds and
Puryear have married women who are
Choctaws. Then the material inquiry in
this case is, Were the wives of Reynolds
and Puryear Choctaw Indians? In order to
give this court jurisdiction, one of these

women must have been a member of the body politic which is composed of the citizens of the United States, and the members of which are subject to the laws of the United States; in other words, she must have been a citizen of the United States. What does the evidence show? It shows that the wife of Reynolds was born in the state of Mississippi, and that her mother had Indian blood in her veins, and that her father was a full-blooded Choctaw. If we invoke the principle that when the members of an Indian tribe scatter themselves among the citizens of the United States, and live among the people of the United States, they are merged in the mass of our people, owing complete allegiance to the government of the United States, and, equally with the citizens thereof, subject to the jurisdiction of the courts thereof. (Senate Report 268, p. 11, 41st Cong. 3d Sess.; 2 Story, Const. 655; [Dred Scott v. Sandford], 19 How. [60 U. S.] 403) it may, to say the least of it, become a very serious question whether Mrs. Reynolds is, under the evidence in this case, a Choctaw Indian, notwithstanding her Indian blood. But suppose it is conceded that she is an Indian of the Choctaw Tribe, that is not enough.

Reynolds being a white man by nationality, by birth, and, if at all, only an Indian by marriage, in order to take away the right of this court to try him for the alleged killing of Puryear, he (Puryear) must also be an Indian, either by blood or marriage; because the court still has jurisdiction if one of the parties—either the party committing the offence or the party against whom it is committed—is one of the white race, or belongs to the nationality of the people of the United States. Is Puryear an Indian? He is not by blood. Is he by marriage? What is the status of his wife? If she is not an Indian in law, then he is not made a Choctaw by marriage with her; and if not, the question of his residence at the time he was killed cuts no figure in the case, for if he was a white man in law, and was killed in the Indian country by Reynolds, although Reynolds may have been an Indian, this court has jurisdiction under the treaty. If either marriage with an Indian or residence in the Indian country is wanting, white persons are not Choctaws. What does the evidence show as to the nationality of Mrs. Puryear? It shows that her mother had some Indian blood in her veins; that her father also had some Indian blood, but that her paternal grandfather was a full-blooded white man; that she was born and raised in the state of Mississippi, and married to Mr. Puryear in that state. Now we must find to what nationality she belongs—if she is a citizen of the United States or a Choctaw woman. In order to do this we must find some rule to guide us in tracing her nationality. If we desire to do this correctly we must look to the status of the Indian people. They are not citizens, although born in the United States; at least the courts have

always so held. Whether the government can subject them to its jurisdiction is not a material question here. It has not been done in the case of an offence committed by one Indian upon another; and, under the laws as they now stand, not being subject to the jurisdiction of the United States, they are not citizens thereof. Under the laws as they now are, these Indians, if members of a tribe, are not citizens or members of the body politic. The tribes are permitted by the United States to exist as distinct nations, or as distinct political societies, separated from others, capable of managing their own affairs and governing themselves.

In the case of Jackson v. Goodell, 20 Johns. 193, the court, Mr. Justice Kent delivering the opinion, says: "In my view they (the Indians) have never been regarded as citizens or members of our body politic." * * * Again: "Still they are permitted to exist as distinct nations. * * * The Indians, though born within our territorial limits, are considered as born under the dominion of their own tribes. * * * In the treaties made with them we have the forms and requisites peculiar to the intercourse between friendly and independent states, and they are conformable to the received institutes of the law of nations. What more demonstrable proof can we require of existing and acknowledged sovereignty?"

In Cherokee Nation v. State of Georgia, 5 Pet. [30 U. S.] 1, Chief Justice Marshall, among other things, says: "Is the Cherokee Nation a foreign state in the sense in which that term is used in the constitution? The counsel for the plaintiffs have maintained the affirmative of this proposition with great earnestness and ability. So much of the argument as was intended to prove the character of the Cherokees as a state, as a distinct political society separated from others, capable of managing its own affairs and governing itself, has, in the opinion of the majority of the judges, been completely successful. They have been uniformly treated as a state from the settlement of our country. The numerous treaties made with them by the United States recognize them as a people capable of maintaining the relations of peace and war, of being responsible in their political character for any violations of their engagements or for any aggressions committed on the citizens of the United States by any individual of their community. Laws have been enacted in the spirit of these treaties. The acts of the government plainly recognize the Cherokee Nation as a state, and the courts are bound by those acts."

Mr. Justice Johnston, who delivered a separate opinion in this case, states the condition of the Indian tribes: "Their right to personal self-government has never been taken from them, and such a form of government may exist, though the land occupied be in fact that of another. The right to expel them may exist in that other, but the alternative of departing and retaining the right

of self-government may exist in them, and such they certainly do possess. It has never been questioned." * * *

In Worcester v. State of Georgia, 6 Pet. [31 U. S.] 515, Chief Justice Marshall again reviewed the relations existing between our government and the Indian tribes. In speaking of the relations of the Cherokee Nation to the United States under the treaties made with them, he says: "This relation was that of a nation claiming and receiving the protection of one more powerful; not that of individuals abandoning their national character and submitting as subjects to the laws of a master." * * * Again: "From the commencement of our government congress has passed acts to regulate trade and intercourse with the Indians, which treat them as nations, respect their rights, and manifest a firm purpose to afford that protection which treaties stipulate. All of these acts, and especially that of 1802, which is still in force, manifestly consider the several Indian nations as distinct political communities—having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries; which is not only acknowledged, but guaranteed, by the United States." And again: "The very term 'nation,' so generally applied to them, means a people distinct from others. The constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and consequently admits their rank among those powers which are capable of making treaties. The words 'treaty' and 'nation' are words of our own language, selected in our diplomatic and legislative proceedings by ourselves, having a definite and well-understood meaning. We have applied them to Indians as we have applied them to other nations of the earth; they are applied to all in the same sense."

Again, in the case of The Kansas Indians, 5 Wall. [72 U. S.] 737, the supreme court of the United States held: "If the tribal organization of Indian bands is recognized by the political department of the national government as existing—that is to say, if the national government makes treaties with and puts its Indian agents among them, paying subsidies and dealing otherwise with 'head men' in its behalf—the fact that the primitive habits and customs of the tribe, when in a savage state, have been largely broken into by their intercourse with the whites, in the midst of whom, by the advance of civilization, they have come to find themselves, does not authorize a state government to regard the tribal organization as gone, and the Indians as citizens of the state where they are, and subject to its laws."

The supreme court of the United States again gave its views of the status of the Indian in the case of Dred Scott v. Sandford, 19 How. [60 U. S.] 403. Speaking by the chief justice, the court declares: "That the Indian race formed no part of the colonial communities, and never amalgamated with them in social connections or in government. But, although they were uncivilized, they were yet a free and independent people, associated together in nations or tribes, and governed by their own laws. Many of these political communities were situated in territories to which the white race claimed the ultimate right of dominion; but that claim was acknowledged to be subject to the right of the Indians to occupy it as long as they thought proper; and neither the English nor the colonial governments claimed or exercised any dominion over the tribe or nation by whom it was occupied, nor claimed the right to the possession of the territory until the tribe or nation consented to cede it. These Indian governments were regarded and treated as foreign governments—as much so as if an ocean had separated the red man from the white; and their freedom has constantly been acknowledged, from the time of the first emigration of the English colonies to the present day, by the different governments which succeeded each other. Treaties have been negotiated with them, and their alliance sought for in war; and the people who compose these Indian political communities have always been treated as foreigners not living under our government. * * * But they may, without doubt, like the subjects of any other foreign government, be naturalized by the authority of congress, and become citizens of a state and of the United States; and if an individual should leave his nation or tribe and take up his abode among the white population, he would be entitled to all the rights and privileges which would belong to an emigrant from any other foreign people."

Now, what is the principle to be deduced from all of these decisions of the supreme court? Why, that in cases where the United States has not, by its legislative or other acts, incorporated these people into the political body known as the people of the United States, who, according to our republican institutions, form the sovereignty, and who hold the power and conduct the government, they are not citizens. These nations or tribes may not be absolutely independent powers—they may be domestic, dependent nations; but as long as the government of the United States, through its legislative department, continues to treat them as beyond the jurisdiction of the United States, so long they must be held to be quasi foreign nations, whose citizens are not regarded as American citizens, and not subjected to the full responsibility of such citizens. If the government of the United States has never recognized them as subject to its jurisdiction, and they have consequently never been treated as citizens, they occupy the same position before the law as though they were citizens of a power entirely independ-

ent of us, or were the people who were the citizens of a foreign power. If this be true, when the question arises as to what people a person belongs, what rule is to govern in the solution of the problem?

There is no statute law on the subject. We find that the question before the country at one time, as to who was a white person and who was a member of the African race, was solved by legislative or constitutional enactments defining the nationality of persons according to the quantum of white or African blood in the veins of the persons.

These laws were all enactments of the states, and had reference to the African race alone. The United States never had any statute law on the subject (and has not now) with regard to persons who are not subject to its jurisdiction. Now, in this case, as the 38th article of the treaty only permits an American citizen, or a white person, to expatriate himself—to throw off his allegiance to the government of the United States—and place himself beyond the jurisdiction of its courts by marriage to a Choctaw and residence in their country, we must somewhere find a rule to define who is a Choctaw, in a case where there is mixed parentage. Does the quantum of Indian blood in the veins of the party determine the fact as to whether such party is of the white or Indian race? If so, how much Indian blood does it take to make an Indian, or how much white blood to make a person a member of the body politic known as American citizens? Where do we find any rule on the subject which makes the quantum of blood the standard of nationality? Certainly not from the statute law of the United States; nor is it to be found in the common law. In the case of United States v. Sanders [Case No. 16,220], the court held that the quantum of Indian blood in the veins did not determine the condition of the offspring of a union between a white person and an Indian; but further held that the condition of the mother did determine the question. And the court referred to the common law as authority for the position that the condition of the mother fixed the status of the offspring. The court is sustained in the first position by the common law, and also in the last position, if applied to the offspring of a connection between a freeman and a slave, upon the principle handed down from the Roman civil law, that the owner of a female animal is entitled to all her brood, according to the maxim partus sequitur ventrem. But by the common law this rule is reversed with regard to the offspring of free persons. Their offspring follows the condition of the father, and the rule partus sequitur patrem prevails in determining their status. 1 Bouv. Inst., 198, § 502; 31 Barb. 486; 2 Bouv. Law Dict. 147; Shanks v. Dupont, 3 Pet. [28 U. S.] 242. This is the universal maxim of the common law with regard to freemen—as old as the common law, or even as the Roman civil law, and as well settled as the rule partus sequitur ventrem—the one being a rule fixing the status of freemen; the other being a rule defining the ownership of property—the one applicable to different political communities or states, whose citizens are in the enjoyment of the civil rights possessed by people in a state of freedom; the other defining the condition of the offspring which had been tainted by the bondage of the mother.

No other rules than the ones above enumerated ever did prevail in this or any other civilized country. In the case of Ludlam v. Ludlam, 31 Barb. 486, the court says: "The universal maxim of the common law being partus sequitur patrem, it is sufficient for the application of this doctrine that the father should be a subject lawfully, and without breach of his allegiance beyond sea, no matter what may be the condition of the mother."

The law of nations, which becomes, when applicable to an existing condition of affairs in a country, a part of the common law of that country, declares the same rule. Vattel, in his Law of Nations (page 101), says: "As the society cannot exist and perpetuate itself otherwise than by the children of the citizens, these children naturally follow the condition of their fathers and succeed to their rights. * * * The country of the father is, therefore, that of the children, and these become true citizens merely by their tacit consent." Again, on page 102, Vattel says: "By the law of nature alone, children follow the condition of their fathers and enter into all their rights." This law of nature, as far as it has become a part of the common law, in the absence of any positive enactment on the subject, must be the rule in this case.

These Indians are freemen; the paternal ancestors of Mrs. Puryear were freemen. The rule applicable to the offspring of freemen is certainly applicable here, if the status of the Indian nations is as declared so often by the supreme court of the United States, because, if that be their true status as tribes or nations, the question is to be solved in the same way as if one parent was a citizen of the United States and the other a citizen of a foreign nation.

The evidence in the case showing that the paternal grandfather of Mrs. Puryear was a white man, living in the state of Mississippi, and not with an Indian tribe—a citizen of the state of Mississippi and of the United States—the principles above enumerated make her father a citizen of the United States, and subject to the jurisdiction of the courts thereof. The same principles would make Mrs. Puryear a citizen of the United States, and subject to the jurisdiction of the courts thereof. That being the case, Mr. Puryear was married to a woman who was legally a member of the white race, or of the body politic known as citizens of the United States. He did not, therefore, become a Choctaw by marriage, but was a citizen of

the United States, and being killed in the territorial jurisdiction of this court, it has jurisdiction, and the writ must be dismissed and the defendant remanded to the custody of the marshal.

Ordered accordingly.