## FARRELL v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. September 30, 1901.)

No. 1,534.

1. CONSTITUTIONAL LAW—PROHIBITING SALE OF INTOXICATING LIQUOR TO INDIAN PATENTEES.

Under its power to regulate commerce with the Indian tribes (Const. art. 1, § 8), congress had authority to pass the act of January 30, 1897 (29 Stat. 506), which declares it to be a crime punishable by fine and imprisonment to sell spirituous liquors to any Indian to whom an allotment of lands has been made while the title thereto is held in trust by the government.

2. CONGRESSIONAL POWER TO REGULATE LIQUOR TRAFFIC WITH INDIAN ALLOTTEES—RENUNCIATION.

Congress did not renounce its constitutional power to regulate the traffic in intoxicating liquors with Indian and mixed-blood patentees while the United States holds the title to their lands in trust for them under the act of February 8, 1887 (24 Stat. 388), by the provisions of that act that such patentees shall have the benefit and be subject to the laws of the state or territory in which they reside, and that they are citizens of the United States, and entitled to all the rights, privileges, and immunities of such citizens, or by any of the other enactments of that statute.

3. PRINCIPAL AND AGENT—OPINION EVIDENCE—CONCLUSIONS OF LAW.

When the authority of an agent is a conclusion of law deducible from various facts, he may not directly testify to it. Where the authority of an Indian agent over a certain Indian was a conclusion of law deducible from the constitution, statutes, and the situation and relations of the Indian, the agent was incompetent to testify what his authority was.

4. SAME.

An agent may testify to the actual exercise of authority, although he is incompetent to testify whether or not he had such authority. An Indian agent may testify that he exercised control over a certain Indian, although his right to exercise that control is a conclusion of law to which he is incompetent to testify.

5. INDIANS—TRIBAL RELATIONS—COURTS FOLLOW EXECUTIVE AND LEGISLATIVE DEPARTMENTS.

In ascertaining the tribal and other relations of Indians, courts generally follow the executive and legislative departments to which the determination of these relations has been specially intrusted.

6. SAME.

A mixed-blood Indian, who has received an allotment and patent of land as a member of a tribe, whose mother was an Indian of that tribe, and whose father was a half-breed who had been recognized as a member of the tribe, is himself a mixed-blood Indian of that tribe, notwithstanding the fact that his grandfather was a white man and a citizen of the United States.

7. INDIANS OF MIXED BLOOD—FOLLOWING MOTHER'S STATUS.

The child of a white citizen and of an Indian mother, who is abandoned by his father, is nurtured and reared by the Indian mother in the

tribal relation, and is recognized by the tribe as a member of it, falls under an exception to the general rule that the offspring follows the status of the father, and becomes a member of the tribe of the mother.
(Syllabus by the Court.)

In Error to the District Court of the United States for the District of South Dakota.

S. B. Van Buskirk, for plaintiff in error.

James D. Elliott (William G. Porter, on the brief), for defendant in error.

Before SANBORN and THAYER, Circuit Judges, and ADAMS, District Judge.

SANBORN, Circuit Judge. Anthony Farrell, the plaintiff in error, was convicted of and sentenced for selling spirituous liquors in South Dakota on January 1, 1900, to Glode La Framboise, a mixed-blood Indian of the Sioux tribe, then in charge of Nathan P. Johnson, an Indian agent of the United States, under the act of January 30, 1897 (29 Stat. 506), which provides that any person who shall sell any spirituous liquor "to any Indian to whom allotment of land has been made while the title to the same shall be held in trust by the government, or to any Indian a ward of the government under the charge of any Indian superintendent or agent, or any Indian including mixed bloods, over whom the government exercises guardianship," shall be punished by imprisonment for not less than 60 days, and by a fine of not less than $100, for the first offense. He urges three alleged errors in his trial: (1) That the Indian agent was permitted to testify that Glode La Framboise was under his charge at the time the offense was committed; (2) that the court refused to charge that, if a paternal ancestor of La Framboise was a white man, he was not a mixed blood over whom the government exercised guardianship, nor an Indian under charge of an Indian agent, and the defendant could not be lawfully convicted of selling liquor to him; and (3) that the court refused to hold that the act of January 30, 1897, was either unconstitutional or inapplicable to a mixed-blood Indian who had received an allotment and patent of land and had become a citizen of the United States and of the state of South Dakota under the act of February 8, 1887 (24 Stat. 388).

1. Nathan P. Johnson testified that his residence was the Sisseton agency, that he was the United States Indian agent, and that he knew Glode La Framboise. He was then asked whether or not La Framboise was under his charge as Indian agent at that place on January 1, 1900, and over objection of counsel for Farrell that the question called for a conclusion, and over his exception, he was allowed to answer that he was. The objection to this ruling is that the true answer to this question is a legal conclusion deducible from La Framboise's situation, the acts of congress, and the regulations of the Indian department, and provable only by the facts which conditioned the situation and relations of La Framboise, and not by the direct assertion of any witness. So far as the question and its answer tend to prove the right of the agent to superintend and control

the actions of this Indian of mixed blood, the objection is well taken. But it ignores another material issue upon which the testimony was not incompetent, and that was whether or not this agent was in fact exercising. his powers of supervision and control as an Indian agent over this mixed blood. If the situation of La Framboise and his relation to his tribe had been proved to be such that under the statutes and regulations the agent had the right to take charge of him, a further material question, whether he had actually done so or not, would still have been unanswered, and the testimony of the agent would have been competent to answer it. It was not less competent, in the absence of all objection to the order of the proof, because it was asked before the situation and relations of La Framboise had been established by the evidence. The testimony of an agent to the authority he has actually exercised may be competent evidence, when his right to exercise that authority is a conclusion of law, to which he cannot lawfully testify.

2. The Indian agent testified that La Framboise was a quarter white,—a mixed-blood Indian; that he belonged to the Sioux tribe of Indians; that he was a married man; that his children went to the government school under his charge, a mile and a half from the agency; that they were clothed like white men, and went on and off the reservation when they pleased, except when they were going to other agencies. La Framboise testified that he was a mixed-blood Indian. His father testified that he (the father) lived near Veblin, S. D.; that his father was a white man and a citizen of the United States, and that he thought he was, but they passed him for an Indian; that he was a half-breed, and his wife was a half-breed; that he voted and paid taxes in South Dakota; that his son had lived on the land he then occupied several years before the reservation was opened; and that he voted, paid taxes, and did not wear Indian clothes. A patent dated June 19, 1889, which recited that the land on which Glode lived was allotted to "Glode La Framboise, an Indian of the Sisseton and Wahpeton tribe or band," on May 10, 1888, under the act of February 8, 1887 (24 Stat. 388), and that the United States would hold it in trust for him and his heirs for 25 years, and would then convey it to him, was introduced in evidence. It is assigned as error that in this state of the case the court refused to charge that if the paternal ancestor of Glode La Framboise was a white man the jury could not find the defendant guilty, and that this would be true whether his father or grandfather was a white man. This assignment rests on the general rule that the children of free parents follow the status of their father. Vatt. Law Nat. 101, 102; Ex Parte Reynolds, 5 Dill. 394, 403, Fed. Cas. No. 11,719; U. S. v. Ward (C. C.) 42 Fed. 320, 322; Ludlam v. Ludlam, 31 Barb. 486. But there is an exception to this rule which has been generally recognized and acted upon by the legislative, the executive, and judicial departments of this government, and by the Indian tribes in their intercourse with the United States. It is that the child of a white citizen and an Indian mother who is abandoned by the father, and is nurtured and reared by the Indian mother in the tribal relation, and is recognized by the

tribe as a member of it, follows the status of the mother, and becomes a member of the Indian tribe. U. S. v. Hadley (C. C.) 99 Fed. 437, 438. The Indians have usually recognized such children as members of their tribes, and have in their treaties jealously protected their rights either as Indians, half-breeds, or mixed bloods, and the acts of congress have often placed them on the same plane with other members of the tribes. There was no evidence that the father of La Framboise was born under the sanction of a lawful marriage, or that his grandfather ever lived with his grandmother or assisted to rear her children. The rational inference from the testimony of his father is that he did not. He testified, "My father was a white man, so they tell me,"—a statement which naturally leads to the conclusion that he never saw him, and so did not know his color. Moreover, the executive department of the government had evidently decided that the father of La Framboise followed the status of his mother, for he said he thought he was a white man, but they passed him for an Indian. And Glode La Framboise himself had been recognized as an Indian by the interior department, and had received his allotment of and patent to land as such under the act of 1887. In ascertaining the tribal relations of Indians and mixed bloods it is the rule of the courts to follow the action of the executive or political department to which the determination of those relations is specially intrusted. U. S. v. Holliday, 3 Wall. 407, 419, 18 L. Ed. 182; U. S. v. Earl (C. C.) 17 Fed. 75, 78. There was no evidence in this case which demanded a departure from this rule, and the court below properly refused to instruct the jury that the defendant could not be guilty if La Framboise's grandfather was a white man, and rightly charged them that, under the evidence and the decision of the interior department disclosed by the patent, he was a mixed-blood Indian of the Sioux tribe.

3. But the chief reliance of counsel for the plaintiff in error in his attempt to reverse the judgment below seems to be upon the proposition that this mixed-blood Indian had by his acceptance of the act of February 8, 1887, become a full-fledged citizen of the United States, and had thereby withdrawn himself from the jurisdiction of congress to superintend or regulate commerce or intercourse with him, and hence to punish any one for the sale of intoxicating liquors to him under the act of 1897. Counsel state the proposition in two forms: (1) That the act of 1897 is inapplicable to the sale of liquor to such an Indian, because his superintendence and control are not within the jurisdiction or power of congress, and hence the presumption must be that the act of 1897 was never intended to apply to the superintendence or control of commerce with such an Indian; and (2) that the act of 1897, which by its express terms applies to a sale of spirituous liquor to him, is unconstitutional, because the congress has no power to regulate commerce with him. The question which must determine this case, however, is single, and it is, did congress in 1897 have the jurisdiction, the power, to regulate commerce with this Indian? If this question is answered in the affirmative, the conviction was right and must be affirmed, because the act of 1897 ex-

110 F.—60

pressly provides that the sale of liquor "to any Indian to whom allotment of land has been made while the title to the same shall be held in trust by the government or to any Indian or ward of the government under charge of any Indian superintendent, or agent, or any Indian including mixed bloods, over whom the government exercises guardianship," shall be punished, and La Framboise is clearly designated in at least two clauses of this statute. If the question is answered in the negative the conviction cannot be sustained, because in that event the enactment which made it a crime to sell liquor to Indian allottees was either inapplicable to the case of La Framboise, or was unconstitutional and void. The only question, therefore, which will be considered here is whether or not congress had the power in 1897 to regulate commerce with this Indian under the constitution. The constitution provides that congress shall have the power "to regulate commerce * * * with the Indian tribes." Article 1, § 8. This grant of authority includes the power to regulate intercourse with the individual members of such tribes, and therefore the power to regulate the sale of intoxicating liquors to such members, for the sale of liquors is commerce. U. S. v. Holliday, 3 Wall. 415, 416, 419, 18 L. Ed. 182; U. S. v. Shaw-mux, 27 Fed. Cas. 1049 (Fed. Cas. No. 16,268). The Indian tribes are domestic dependent nations, and they and their members are wards of the United States. Cherokee Nation v. Georgia, 5 Pet. 1, 8 L. Ed. 25; U. S. v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228. In accordance with these incontrovertible rules the United States, by means of acts of congress and treaties with the tribes, has maintained agents among them through whom it has regulated commerce with them, prohibited the sale of intoxicating liquors to them, distributed food, clothing, and implements of husbandry among them, has sought to protect their persons from the violence and their property from the avarice of the white man, and has used money and persistent endeavors to induce them to adopt agricultural pursuits and to educate their children in the arts of civilization. It has pursued this course for many decades, until this has become the settled policy and practice of the nation,—a policy and practice which are concededly warranted by the constitution and sustained by the uniform decisions of the supreme court. Presumptively, therefore, congress had the power to regulate the commerce with this particular Indian, to prohibit the sale of liquor to him, and to punish a violation of this inhibition. The argument of counsel for the plaintiff in error in contravention of this presumption is: Congress has no power to regulate intrastate commerce with any citizen of the republic. This Indian was a citizen of the nation and of the state of South Dakota when the act of 1897 was approved. Therefore that act was unconstitutional and void in so far as it interfered with his commerce with other citizens,—with his purchase of intoxicating liquors from them. The contention rests upon the following propositions of law and provisions of constitutions and statutes: Congress has no right or power to interfere with the internal trade of a state further than it is necessary to do so to exercise its power to regulate commerce among

the states, with foreign nations, and with the Indian tribes, and it has no authority to prohibit the sale of liquor to this Indian unless it derived it from the grant to it of power to regulate commerce with the Indian tribes. U. S. v. Dewitt, 9 Wall. 41, 44, 45, 19 L. Ed. 593; Liquor License Cases, 5 How. 504, 586, 12 L. Ed. 256; License Tax Cases, 5 Wall. 470, 471, 18 L. Ed. 497. The act of congress of February 8, 1887, provides that the president may allot and patent to the members of Indian tribes land selected by them respectively within their respective reservations which is advantageous for agricultural and grazing purposes (section 1); that the patents shall be to the effect that the United States will hold the title to the respective allotments in trust for the sole use of the patentees and their heirs for the period of 25 years, and as much longer as the president, in his discretion, may extend the period; that it will then convey them to the respective patentees and their heirs; that all conveyances and contracts touching the same made before such conveyances shall be void (section 2); that the government may purchase of the tribes and open to settlement that portion of their reservations not so selected and allotted (section 5); that upon the completion of the allotments all members of the tribes to whom allotments have been made "shall have the benefit of, and be subject to the laws both civil and criminal of the state or territory in which they may reside"; that "every Indian born within the territorial limits of the United States to whom allotments have been made under the provisions of this act * * * is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges and immunities of such citizens" (section 6; 24 Stat. 490). La Framboise had received his allotment and patent, and the lands within the reservation of the Sisseton and Wahpeton bands of Sioux Indians, to which he belonged, that had not been allotted, had been opened to settlement under this act, before the act of 1897 was passed. His patent was issued on June 15, 1889. The unallotted portion of the reservation of his bands was opened to settlement on April 15, 1892 (26 Stat. 1036; 27 Stat. 1017). The constitution of the United States provides that congress shall have power "to establish an uniform rule of naturalization" (article 1, § 8), and that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." Amend. 14, § 1. The Revised Statutes read, "All persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are declared to be citizens of the United States." Section 1992. The constitution of South Dakota (article 7, § 1) and the statute of that state (Laws Dak. 1889, c. 61, § 2) confer upon citizens of the United States residing in that state, and hence upon this Indian, the right to vote and to hold office therein.

Under these constitutions and statutes the concession must be made that this Indian was a citizen of the United States and of the state of South Dakota in 1897, and that the argument of counsel for

the plaintiff in error that he thereby became exempt from the jurisdiction of congress to regulate commerce with him is very persuasive and entitled to grave consideration. But is it sound? May not the government confer all the privileges and immunities of citizenship upon its wards, and yet retain its power to regulate commerce with them; to protect them against their appetites, passions, and incapacity? And, if it may lawfully do so, has it not done so in the case of the Indians of the Sisseton and Wahpeton bands? The true answer to these questions is not to be found in isolated statutes and constitutional provisions, but in a general view of the treaties, legislation, policy, and purpose of the nation in its dealings with the members of Indian tribes. As we have already seen, the Indians of the Sisseton and Wahpeton bands were prior to the act of 1887 wards of the government in the charge of an Indian agent protected against the sale of intoxicating liquors to them by constitutional legislation, and incited to adopt agricultural pursuits, and to permit their children to be educated by the government, under the settled policy and practice of the nation. The statutes provided that "each Indian agent shall within his agency manage and superintend the intercourse with the Indians, agreeably to law; and execute and perform such regulations and duties not inconsistent with law as may be prescribed by the president, the secretary of the interior, the commissioner of Indian affairs, or the superintendent of Indian affairs." Rev. St. § 2058. And these regulations require the agents to use their utmost vigilance in enforcing the penalties of the law against all persons who engage in the traffic in intoxicating liquors with the Indians, and to instruct and encourage those to whom allotments have been made to cultivate their farms. The great desideratum sought by this policy was the abandonment by the Indians of the chase,—of the wandering, idle, pastoral life to which they were addicted, and from which they were unable, as their reservations diminished, to obtain sustenance,—the adoption by them of agricultural pursuits, and the permanent occupation and cultivation by each Indian of a separate tract of land, by means of which he could obtain for himself and for his family a comfortable living, and could relieve the government of his dependence. This purpose is evident in nearly all the legislation, treaties, and acts of congress which deal with the Sisseton and Wahpeton bands. In 1863 the home of these bands was in the state of Minnesota, and congress passed an act for their removal beyond the confines of the states, which provided that the president should set apart for them a tract of land without the states sufficient to enable him to assign 80 acres of good agricultural land to each Indian; that the money annually appropriated for them should not be paid in money, but should be expended in such manner as would "in the judgment of the secretary of the interior best advance the Indians in agricultural and mechanical pursuits and enable them to sustain themselves without the aid of government"; that they should be subject to the laws of the United States, to the criminal laws of the state or territory in which they should reside, and "to such rules and regulations for their government as the secretary of the inte-

rior may prescribe"; and that the secretary should make reasonable provision for their education according to their capacity and the means at his command. 12 Stat. p. 819, c. 119. On February 19, 1867, the United States made a treaty with these bands which provided that the Lake Traverse reservation, from which the allotment to Glode La Framboise was made, was set apart to them for their permanent reservation; that this reservation should be apportioned in tracts of 160 acres to each head of a family or single person over 21 years of age belonging to the bands who should desire to locate permanently thereon and cultivate the soil as a means of subsistence; that any allottee under this treaty who should occupy and cultivate a portion of his tract for 5 consecutive years, and should have 50 acres thereof fenced, plowed, and in crop, should be entitled to a patent to himself and his heirs for his tract, but that the title should be inalienable to any one but the United States; that, to enable the Indians of these bands to enter at once upon an agricultural life, there should be expended on this reservation for their benefit $350,000 in 1867, $250,000 in 1868, $100,000 in the year 1869, $50,000 in the year 1870, and $30,000 annually thereafter; that an agent should be appointed for them, who should be located at Lake Traverse; that the expenditures should be made for the agricultural improvement and civilization of the Indians, but that no issue of goods, provisions, or other articles, except houses to allottees, should be made to Indians or mixed bloods, except in payment for labor performed or to be performed, or for produce delivered, save that when persons in the bands were unable to labor by reason of age, sickness, or deformity, the agent might issue clothing and subsistence to them from the supplies provided for the bands. 15 Stat. 506. On December 12, 1889, the United States made another treaty with these bands of Indians, whereby it agreed to pay them $2.50 per acre for all the unallotted lands on their reservation, and to hold the purchase price of these lands and interest thereon at 3 per cent. per annum in its treasury for the sole use of these bands of Indians, subject to appropriation by congress for the education and civilization of the bands and their members. 26 Stat. 1036, art. 2. And on March 3, 1891, congress appropriated $2,203,000 for the purpose of carrying out this agreement. 26 Stat. 1038, § 27. On or about April 15, 1892, the allotments to these Indians under the act of 1887 had been completed, and the unallotted lands were opened to settlement. In 1897 congress provided that the allottees might lease their lands for three years for agricultural and grazing purposes (30 Stat. 75), and in 1898 it declared that such leases should be void unless they were first approved by and filed with the secretary of the interior. Since the allotments were made, congress has appropriated the amounts required to pay these bands the annuities stipulated to be paid to them in the treaty of 1889 (27 Stat. 133; 30 Stat. 75, 583, 935; 31 Stat. 232). And since they received their allotments and patents, as before, it has maintained among them a government school for their education, and an Indian agent to superintend their actions, and to instruct and encourage them to occupy and cultivate

their land. In 1897 it expressly declared that the sale of intoxicating liquor to them was unlawful and punishable by fine and imprisonment.

The review of the provisions of the acts of congress and of the treaties which are relevant to the question at issue in this case is now completed, and it leads us to seriously question the main premise of the argument for the plaintiff in error, viz. that congress has no power to regulate commerce with any citizen of the nation. These Indians are citizens, but they were originally wards. The nation had the right to prohibit the sale of liquor to them and to control and superintend their acts and proceedings. They were reasonable, friendly, peaceable, when sober; wild, passionate, and dangerous, when drunk. It adopted the settled policy of prohibiting the sale of intoxicating liquors to them to protect Indians and white men alike. Had it not the right to grant them all the privileges and immunities of citizens, and still to retain its power to protect them and their neighbors from the baleful effects of intoxication? The question is susceptible of but one true answer. It had the same right and authority to retain this power of control over the commerce with these Indians that it had to retain the title to their lands in trust for them for 25 years or longer. It is contended that the retention of this control is inconsistent with the grant to them in the act of 1887 of all the rights, privileges, and immunities of citizenship. But the privilege of buying whisky at all times and in all places is not one of the rights, privileges, or immunities of citizenship, within the meaning of the constitution of the United States. If it were, all the prohibitory laws of the states would be void, for the fourteenth amendment to the constitution provides that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States," and yet many states have enacted laws, that no one would claim were unconstitutional, which prohibit the sale of intoxicating liquors, except for medicinal purposes, to all the citizens of the United States residing in their states. The truth is that the deprivation of these Indians of the right to buy intoxicating liquors is not the taking away from them of any privilege or immunity of citizenship, but it is an attempt to confer upon them an additional immunity which some citizens do not possess,—an immunity from drunkenness and its pernicious consequences. The government then had the power to retain its control over this baneful traffic with these Indians, and its retention was not inconsistent with its grant to them of the rights, privileges, and immunities of citizenship. Did it exercise its right and retain its power? It had this authority prior to the allotments under the act of 1887, and the burden is on him who assails it to show that it has been released or renounced. It had been the unvarying policy of the nation to retain and exercise this power for more than half a century. The wards of the government needed protection from this pernicious traffic as much after their allotments had been made and their patents had been issued as they did before. The issue of patents to them did not change the appetites, passions, character, habits, disposition, or capacity of these

Indians. It did not radically change the title to the lands reserved for them, or their need of care and education. The government held the title to their reservation in trust for them collectively before, it held the title to their allotments in trust for them individually after, the issue of the patents. There was every reason why congress should retain and exercise its power to superintend the trade with them, and none to induce it to renounce it. By the treaty of 1867 the United States agreed to appoint and maintain an agent for these Indians at Lake Traverse, and by its legislation and the rules of the interior department it made it the duty of this agent to use every endeavor to suppress the traffic in intoxicating liquors with them, to educate them, and to induce them to cultivate the soil. There has been no express abrogation of this agreement in any subsequent treaty or act of congress, and the government has continued to comply with it since the allotments as it did before. Agreements are not released or abrogated and statutes are not repealed by implication unless the subsequent agreements or laws are necessarily repugnant to those which preceded them. If the earlier and the later are susceptible of contemporaneous execution, they must be read, construed, and enforced together. The agreement to maintain the agent and the retention and exercise of the power to control the liquor traffic are not inconsistent, as we have seen, with the allotment of the lands in severalty, or with the grant to the allottees of the immunities and privileges of citizenship. Neither the act of 1887 nor any other act of congress or treaty with these Indians required those who selected allotments and received patents and the privileges and immunities of citizenship to sever their tribal relation, or to surrender any of their rights as members of their tribes, as a condition of the grant, so that after their allotments, as before, their tribal relation continued. And finally the legislative and executive departments of the government to which the subject-matter of the relations of the Indians and their tribes to the United States, and the regulation of the commerce with them, has been specially intrusted, have uniformly held that congress retained, and have constantly exercised, the power to regulate intercourse with these Indians, and to prohibit the traffic in intoxicating liquors with them, since these patents issued, to the same extent as before their lands were allotted in severalty. It is the settled rule of the judicial department of the government, in ascertaining the relations of Indian tribes and their members to the nation, to follow the action of the legislative and executive departments, to which the determination of these questions has been especially intrusted. U. S. v. Holliday, 3 Wall. 407, 419, 18 L. Ed. 182; U. S. v. Earl (C. C.) 17 Fed. 75, 78.

The question which has been discussed is a serious one, and it is not free from doubt. It has received investigation, study, and deliberation. The following authorities in addition to those which have already been cited have been read and carefully considered: In re Lelah-puc-ka-chee (D. C.) 98 Fed. 429, 433; U. S. v. Rickert (C. C.) 106 Fed. 6; Smythe v. Henry (C. C.) 41 Fed. 705, 707; In re Coombs, 127 Mass. 278, 279; Beck v. Real Estate Co., 12 C. C. A.

497, 65 Fed. 34; Lemmon v. U. S., 45 C. C. A. 518, 106 Fed. 650; U. S. v. Hurshman (D. C.) 53 Fed. 543; U. S. v. Logan (C. C.) 105 Fed. 240. But the considerations to which reference has now been made are persuasive that the courts ought not to hold that congress has renounced its power to prohibit the traffic in intoxicating liquors with Indians who have taken their allotments and patents under the act of 1887, but for whom the government still holds their lands in trust, until the legislative department of the government gives more positive indications of its intention so to do. The original condition of these Indians as wards of the government; the original power of congress to regulate commerce with them; the settled policy and practice of the nation to prohibit traffic with them in intoxicating liquors; the stipulation of the treaty of 1867 that the government would appoint an agent, whose duty it has always been to suppress this traffic; the absence of any condition in the act of 1887 requiring allottees to surrender their tribal relation or tribal property; the continuing need of the suppression of the liquor traffic with them while the government holds their lands in trust for the individual Indians as well as while it held them in trust for the same Indians collectively; the absence of any express renunciation of its power by congress, and of any treaty or act of congress repugnant to its retention and exercise; the holding of both the legislative and executive departments that it still exists, notwithstanding the allotments and patents under the act of 1887; the uniform exercise of this authority and the continuing endeavor of these departments to suppress this baleful traffic in spirituous liquors with these Indians since their patents were issued as before,—compel the conclusion that congress has never renounced its power to regulate this commerce, and that the act of 1897 is neither unconstitutional nor inapplicable to the case at bar. Eells v. Ross, 12 C. C. A. 205, 64 Fed. 417; U. S. v. Logan (C. C.) 105 Fed. 240, 241.

The judgment below must accordingly be affirmed, and it is so ordered.