DAVIS et al. v. SITKA SCHOOL BOARD.

(First Division. Juneau. January 29, 1908.)

No. 534.

1. SCHOOLS AND SCHOOL DISTRICTS (§ 151*)—PUPILS—ELIGIBILITY—INDIANS—MANDAMUS.

Dora and Tillie Davis are the children of Fred Davis deceased, who was a full-blood Sitka Indian, and his wife, who was of mixed white and Indian blood. Their parents were legally married on December 14, 1896, and both children were born in

---

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

lawful wedlock and are of mixed blood. After the death of their father, their mother married Rudolph Walton, a full-blood Sitka Indian, who is the guardian ad litem of the children in this case. Walton owns a house in the native village lying on the outskirts of the town of Sitka. The children live there with their mother and stepfather. Walton conducts a store on the edge of the town of Sitka, in which he manufactures and sells Indian curios, and he pays a license as a merchant under the laws of Alaska. He rents a box in the post office, and worked out his road tax in the Sitka road district, when warned out by the overseer. He and his family have adopted the white man's style of dress. He is an industrious, law-abiding, intelligent native. He conducts his business according to civilized methods, even to the installation of an expensive cash register in his store. He speaks, reads, and writes the English language. The Waltons are members of the Presbyterian Church. What is the manner of their life, their domestic habits, and who are their associates and intimates, does not appear in the evidence. *Held* that, while the Davis children are of "mixed blood," they do not "lead a civilized life," within the meaning of section 7 of the act of Congress of January 27, 1905 (33 Stat. 617, c. 277), so as to entitle them to attend the public schools maintained for "white children and children of mixed blood who lead a civilized life." *Held*, that mandamus will not lie to compel the school board of Sitka to admit such children to the public schools therein; it appearing that the government maintained a separate school for Eskimos and Indians "under the direction and control of the Secretary of the Interior."

[Ed. Note.—For other cases, see Schools and School Districts, Dec. Dig. § 151.*]

A writ of mandamus is sought in this cause to require the defendants, comprising the School Board for the Sitka School District, to admit the plaintiffs to the Sitka school; it being contended by the plaintiffs that, by virtue of the provisions of the seventh section of the act of Congress entitled "An act to provide for the construction and maintenance of roads, the establishment and maintenance of schools, etc., in the district

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

of Alaska," and approved January 27, 1905 (33 Stat. 616), they should be permitted to attend and receive instruction in the school thereunder established for the "education of white children and children of the mixed blood who live a civilized life." The plaintiffs sue by their guardian ad litem, Rudolph Walton, and in their complaint allege that they are all children of the mixed blood living a civilized life, residing within the Sitka school district. The alleged status of the parents of each child as to citizenship, race, and mode and habit of life, as well as that of each child, is set up in detail, and it is alleged that the children have been deprived of and refused certain rights and privileges incident to attendance upon and education in the Sitka school, although they had applied for and demanded admittance to the school. It is alleged that the order of the school board refusing admission was promulgated on January 25, 1906, and has not since been vacated.

The defendants, answering to the alternative writ of mandamus, specifically deny, upon information and belief, the several material allegations of the complaint, except that they admit that Dora and Tillie Davis were refused admission to said school because they were not children of mixed blood who lived a civilized life. The answer also contains by way of defense certain affirmative allegations as to parentage, residence, and mode of life, to which it is unnecessary to allude here. These allegations the plaintiffs negative in their reply. The matter was neither tried nor argued before the court, but was upon stipulation referred to a referee to take and report the testimony. That report was submitted upon briefs, which were but recently filed.

W. A. Kelly and Malony & Cobb, for petitioners.

R. W. Jennings and John J. Boyce, for defendants.

GUNNISON, District Judge. The portions of the statute by virtue of which the Sitka school was established, and which

bear on the present controversy, are in sections 5 and 7 of the act of 1905, supra. Section 5 provides that:

"The school district established outside of the towns shall contain not less than twenty white children between the ages of six and twenty years. * * * The petition shall be signed by not less than twelve persons of adult age who are citizens of the United States, or who have declared their intention to become such."

Section 7 is as follows:

"Sec. 7. That the schools specified and provided for in this act shall be devoted to the education of white children and children of mixed blood who lead a civilized life. The education of the Eskimos and Indians in the district of Alaska shall remain under the direction and control of the Secretary of the Interior, and schools for and among the Eskimos and Indians of Alaska shall be provided for by an annual appropriation, and the Eskimo and Indian children of Alaska shall have the same right to be admitted to any Indian boarding school as the Indian children in the states or territories of the United States."

A clear distinction is here made between the school for the native—i. e., the Eskimo and the Indian, whether civilized or otherwise—and the school for the white child, or the child with the white man's blood in its veins, though it be mixed with that of another race. But of the child of mixed blood there is made the further requirement, to wit, that he shall live a civilized life. But why this further qualification? Why not admit any child of mixed blood? From the very inception of the United States, the care and education of the Indian has been one of the problems that has vexed the government. The Indian in his native state has everywhere been found to be savage, an uncivilized being, when measured by the white man's standard. At first, Indians were dealt with as independent tribes, though in later years this attitude was changed. But, whatever the method adopted by the government in its dealings with the aboriginal inhabitants of this continent, it has always regarded him as of a benighted race, in a state of pupilage, a

ward of the nation, needing care, control, protection, and education, and until comparatively recent years incapable of citizenship. And even then when it was thought that under certain conditions some of that race might at last have become capable of intelligently exercising the duties of citizenship, the action or assent of the guardian, the United States, as was said in U. S. v. Boyd, 83 Fed. 553, 27 C. C. A. 592, "was absolutely essential to enable the Indian to renounce the independent condition in which he had been since the adoption of the Constitution."

Nor is the status of the Alaskan native materially different from that of the red men of the States. In an early case (In re Sah Quah [D. C.] 31 Fed. 329), in which the status of the Alaskan Indian was considered, Judge Dawson said:

"The United States has at no time recognized any tribal independence or relations among these Indians [Alaskan], has never treated with them in any capacity; but from every act of Congress in relation to the people of this territory it is clearly inferable that they have been and now are regarded as dependent subjects, amenable to the penal laws of the United States, and subject to the jurisdiction of its courts. * * * They are practically in a state of pupilage, and sustain a relation to the United States similar to that of a ward to a guardian."

It will be seen from the language of the third article of the treaty of March 30, 1867, between Russia and the United States, by which the territory of Alaska became American soil, that the Alaskan natives were classed with the Indians of the states as "uncivilized." It was there stipulated that:

"The uncivilized tribes will be subject to such laws and regulations as the United States may from time to time adopt in regard to the aboriginal tribes of that country."

The aboriginal tribes of Alaska and their descendants are, then, the wards of the nation as truly as are those inhabiting the states with which the government since its organization has had to deal.

But in what relation do those of the mixed blood stand. to the native, and what in the law constitutes a person of mixed blood? It is said in the opinion in Sloan v. United States (C. C.) 118 Fed. 383, that:

"As ordinarily understood by white people, a person of white and Indian parentage is deemed to be of mixed blood, without regard to the source of the Indian blood. In other words, in common parlance the child of a white father and Indian mother, as well as a child of an Indian father and a white mother, are equally of mixed blood, and therefore, when in a convention of Indians half or mixed bloods are included, no distinction can be drawn between those who derive the Indian blood from the mother or those who derive it from the father."

In other words, "mixed blood" means "mixed Indian. blood," regardless of whether it comes from the father or mother, and whether it be half or quarter.

In some of the earlier adjudications upon the subject of the status of the "mixed bloods," some courts followed the technical rule of the common law that children of free-born parents take the legal status of the father. Ex parte Reynolds, 5 Dill. 394, Fed. Cas. No. 11,719; Keith v. U. S., 8 Okl. 446, 58 Pac. 507; U. S. v. Ward (C. C.) 42 Fed. 320. But this rule was held in Sloan v. U. S., supra, not to apply to the case of a person of Indian and white parentage, but that this status was to be determined by the actual relation he bore to the tribe itself. It has been announced as the settled rule of the judicial department of the government, in determining the relation of the Indian tribes and their members to the nation, to follow the action of the legislative and executive departments to which the determination of these questions has been especially intrusted. U. S. v. Holliday, 3 Wall. 407, 18 L. Ed. 182.; Farrell v. U. S., 110 Fed. 951, 49 C. C. A. 183. Following this direction, what do we find? That those of mixed blood who reside with the tribe or among the natives where the tribal relation has been broken down have, as a general rule,

been regarded as Indians. 4 Op. Atty. Gen. 258–260; 7 Id. 174; 7 Id. 753; 20 Id. 743. Everywhere through the statutes relative to the Indian is this rule or evidences of the rule to be found. A necessary deduction to be drawn from this is that the mixed blood is presumed to partake of the character of the tribe with which he lives, whether it be civilized or otherwise. Congress, in providing in the law under consideration that "children of mixed blood who live a civilized life" may participate in these schools, must be presumed to have had in mind the above rule, and the fact, upon which the rule is based, that where mixed bloods live among and associate with the uncivilized, they become subject to and influenced by their environment as naturally as water seeks its level. It was, in my opinion, the intention of Congress that only such of the mixed bloods were to be admitted to those schools as had for themselves, or, in cases where they were minors living with parents or guardians, the parents or guardians had, put off the rude customs, modes of life, and associations, and taken up their abode and life free from an environment which retarded their development in lines of progressive living, systematic labor, individual ownership and accumulation of property, intellectual activity, and well-defined and respected domestic and social relations. For the children of those families which preferred the other life, without its attendant responsibilities and obligations to society at large, was provided a system of education under the control of the Secretary of the Interior, more appropriate to their undeveloped mental condition, and through which they could, in view of their surroundings, be better instructed.

That Congress, by the use of the words "civilized life," had in mind any particular or definite condition to which the "mixed blood," or his parents or guardians, must have attained, cannot be presumed, since the term "civilization" is at best only relative. The standards of civilization which have

been erected for to-day will undoubtedly 100 years hence be
far behind the vanguard of progress. The courts have wise-
ly never essayed to define it. When it has been necessary to
settle the question, no attempt has been made at definition. A
test seemingly sufficient has been framed and applied to the
particular case. U. S. v. Hadley (C. C.) 99 Fed. 437; 6 Am.
& Eng. Ency. of Law, 67, note 3. Philosophers and schol-
ars have been satisfied with definitions of what civilization is
not. Even the writers of encyclopædian articles have, after
devoting much space to the elements of civilization as it has
been in the past and is now viewed by man, balk at a definition
and gracefully end their dissertation with the observation that
it is an open question. Hence each generation must decide
for itself what constitutes the civilized life, and each case in-
volving the question of civilization must be decided upon its
own merits, free and untrammeled by rules laid down by either
philosopher, judge, or encyclopædian.

In the case at bar I am of the opinion that the test to be
applied should be as to whether or not the persons in question
have turned aside from old associations, former habits of life,
and easier modes of existence; in other words, have exchang-
ed the old barbaric, uncivilized environment for one changed,
new, and so different as to indicate an advanced and improved
condition of mind, which desires and reaches out for some-
thing altogether distinct from and unlike the old life. This is
far from a completely satisfactory test; but it will, I appre-
hend, meet the exigencies of the occasion and aid in a just de-
termination of the cause.

Having determined upon a test, inadequate though it may be,
let us examine the facts as they appear from the testimony,
and apply that test to them. The plaintiffs, six in number,
must, since they are minor children of four different families,
be considered with relation to their families and surroundings
—i. e., first, Dora and Tillie Davis; second, John and Lottie

Littlefield; third, Lizzie Allard; and, fourth, Peter Allard.

But, before considering that subject, it may be well to ascertain what is disclosed by the testimony relative to the institution of this proceeding through Walton, the guardian ad litem, who is the stepfather of the Davis children. It appears that the parents of none of the other children were consulted as to this proceeding, nor was Walton himself advised concerning the legal proceedings and steps taken by counsel for securing the admission of his stepchildren to the Sitka school. This fact of itself has, I think, a strong bearing on the attitude of the parents toward the proceedings, as well as their condition and habits of life. It is readily understood that Mr. Kelley, of plaintiffs' counsel, and others who interested themselves on behalf of these children, because of their peculiar field of labor among the native Alaskans, are entirely in earnest in their efforts to advance the conditions of the native children and of the children of the mixed blood. And it is evident from the testimony that the efforts to obtain the admission of these plaintiffs to the school were not so much, if at all, those of the parents as those of Mr. Kelly and his colaborers among the natives. It appears in every instance that the parents were quite content with the schooling obtained by their children in the native school during such part of the year as it was open. Nothing was done by the parents and guardian of the children in furtherance of securing their admission to the Sitka school until after the native school had closed, or before the possibility of attending the Sitka school had been suggested to the parents, and, at least in the case of Lizzie Allard, before such steps had been urged upon the relatives by those having no legal responsibility for or authority over the children. No animadversion is here intended, however, upon those who made these suggestions.

The testimony also discloses the fact that, in the enumeration of the children eligible for the Sitka school made to obtain

data for the petition for the establishment of the school, these plaintiffs were by the enumerator included as children of mixed blood who live a civilized life. This fact is advanced as a reason why the plaintiffs should not be excluded from the school. It is unnecessary to consider this contention, since it is too plain to require argument or citation of authorities that, if the plaintiffs lack the requisite qualifications to entitle them to admission to the school, an erroneous enumeration will not supply the deficiency.

Whether or not the essentials are possessed by these plaintiffs must be ascertained from the testimony, and, in examining this question, the status of each of the four groups of plaintiffs must be considered separately.

The first group consists of Dora and Tillie Davis. They are aged, respectively, eight and seven years, and are the children of Fred Davis, a full-blood Indian, now deceased, and a woman whom some of the witnesses declare is a full-blood native, while others testify that she has white blood in her veins. None seem to know her ancestory. From the testimony, and from an inspection of her photograph (Exhibit D), I am inclined to believe her to be of mixed blood. Davis and his wife were legally married at Sitka, on December 14, 1896. Dora and Tillie Davis, then, were born in lawful wedlock and are of the mixed blood. The mother married again. Her second husband is Rudolph Walton, a full-blood native, and the guardian ad litem of all the plaintiffs in this case. Walton owns a house in the native village, lying on the outskirts of the town of Sitka. The children live there with their mother and stepfather. Their associates and playmates are presumably the native children who live in the Indian village. So far as these plaintiffs are concerned, there is nothing to indicate any difference between them and the other children of the Sitka native village, except the testimony of Walton and others as to Walton's business. Walton conducts a store on the edge of the

town of Sitka, in which he manufactures and sells Indian curios, and for which business he pays the business license tax required by the laws of Alaska. He rents a box in the post office, and has worked out his road tax in the Sitka road district, when warned out by the overseer. He and his family have adopted the white man's style of dress. All who testified concerning Walton himself speak of him as an industrious, law-abiding, intelligent native. He seems, so far as business matters are concerned, to have endeavored to conduct his business according to civilized methods, even to the installation of an expensive cash register in his store. He speaks, reads, and writes the English language. But the testimony fails to disclose a corresponding progress in the domestic and social relations of his family. It does appear that he and his family reside in a house separate and apart from the other natives, and that he clothes and supports his family; but nothing further than that appears. What is the manner of their life? What are their domestic habits? Who are their associates and intimates? These matters do not appear. True, the Waltons are members of the Presbyterian Church; but many natives, for whom the claim of civilization would not be made, are members of churches of the various denominations which are striving to better the conditions in this country. Civilization, though, of course, the term must be considered relative, includes, I apprehend, more than a prosperous business, a trade, a house, white man's clothes, and membership in a church. The burden of establishing that the plaintiffs live the civilized life is upon them, and I fail to find in the testimony evidence of a condition that inclines me to the opinion that the Davis children have that requisite.

The second group is composed of the Littlefield children, John and Lottie, both minors. The testimony in their case is clear and unequivocal that they are children of the mixed blood. They, too, were born in wedlock; their parents having

been married at Sitka, by the Presbyterian missionary, July 1, 1894. John Littlefield, the father, is a white man and a citizen of the United States. The mother is a native. Littlefield, by occupation a laborer, was for some time prior to and at the time of the commencement of this proceeding employed at Kill-isnoo in connection with the fishing industry there conducted. The Littlefield family, like the Waltons, have in the native village at Sitka a separate house, in which they live when there; but it appears that during the fishing season Littlefield lives at Killisnoo, and that his wife and children live there with him, when they are not off with the other natives on hunting and fishing trips. Littlefield, I take it, supports his family. How well or how ill does not appear. Certain it is that the children are unrestrained, and live the life of their native associates, rather than a civilized life.

Lizzie Allard is the next plaintiff whose status is to be considered. She is seven years old, and undoubtedly a child of mixed blood born in lawful wedlock. Her parents are George Allard, an ex-soldier and a citizen of the United States, and a full-blood Indian woman. The mother has been dead for some time. Since her death the child has lived with and has been cared for by her maternal grandmother, "whose white name is Mary Susie." The child's father has contributed but little, practically nothing, to her support during the years since her mother's death. What he did before that does not appear. He is a miner, living here and there at whatever mining camp he can find employment.

Like the Waltons and Littlefields, Lizzie and her grandmother live alone in the grandmother's house in the native village at Sitka. It appears that the child has her own bed, and that upon a sewing machine, also the property of the grandmother, which graces their domicile, Lizzie's clothes are made. Her father, in response to the question, "You say she lives the life of white people?" testified, "They have butter,"

and let it go at that, except that later she said she "had her little bead work." It also appears that the child attends the Russian Indian school, the Russian church, and sings in the choir of that church. Rev. Father Kashaveroff, director of the Russian church and mission at Sitka, testified that Lizzie was of a respectable character, so far as he knew, and that she "acts very nicely." He also testified to a conversation with the child's grandmother, after the Russian school had closed for that year, in which the grandmother told him that she had been urged to put Lizzie in the American school, and that she did not want her to go there.

Lizzie's playmates are children of mixed blood and Indian children living in the Indian village. Practically all her associations are with the natives. During the sealing season, both Lizzie and her grandmother take part in the fishing and hunting expeditions of the native bands, living as do their companions. The grandmother speaks no English. Her testimony in this proceeding was given entirely through an interpreter.

Peter Allard is the last of the plaintiffs. He is the son of William (or "Wasca") Allard, a mixed blood, and a native woman. They were regularly married. Their residence is also in the native village, where the mother owns a house. The father is a laborer, finding a varied and intermittent employment about the town of Sitka. His associates are natives, and from his testimony I conclude that he prefers the life and associations to be found in the Indian village, with an occasional sortie into the white man's world, to a prolonged or permanent residence elsewhere. Nor is this to be considered as altogether strange, or as discrediting him, since he was born and grew to manhood among these people. His friends of a lifetime are there, and some inducement, which to him appears to be great and enticing, must be held out to him before he will turn his back on all those old friends and associations. And this is true of man generally, no matter what his race, color, or blood may

be. It appears that his wife is a good housekeeper, so far as their means and station in life will allow her to be; that the pots and kettles and frying pans are not left upon the floor, after the native fashion, but are hung up, and that curtains drape the windows of their house. This indicates progress; but does it satisfy the test? It is urged that Allard and his wife have been entertained at the home of a former Governor of this territory. Savages, ere this, have been entertained by white men of culture and refinement; but that cannot be considered as a criterion of civilization. To me it is an evidence of the kindliness and of the interest and effort of the hosts in behalf of a people among and for whom they have labored long and assiduously, not an evidence of the civilization of the guests. These isolated instances do not make a condition of life. As we have seen, something more is required to meet the test. Those who from choice make their homes among an uncivilized or semicivilized people and find there their sole social enjoyments and personal pleasures and associations cannot, in my opinion, be classed with those who live a civilized life.

Can it be said, after applying the test to conditions surrounding these plaintiffs and in which they live, that the test is satisfied in a single instance? I am compelled, after a most careful scrutiny of the evidence, to conclude that it is not. In the case of none of the plaintiffs do the conditions disclosed by the evidence lead me to the opinion that his or her family lives a civilized life, and, as in each instance the life of the family is the life of the plaintiff, the same opinion is held with regard to the plaintiffs themselves, though in fairness be it said that Walton himself is far in advance of the others. What his family life may be is not disclosed.

It was urged by the defendants that the right to invoke the aid of the court in this proceeding was a separate and independent right in each plaintiff; that they could not join in the

same writ. This contention is undoubtedly well founded. But, in view of the importance to the community of the interpretation of the statute, it appeared advisable to consider the matter on its merits, rather than to dismiss the proceeding on a technical point.

I am of the opinion that the defendants acted within their powers in refusing these plaintiffs admission. A consideration of those powers is, I take it, unnecessary at this time, since the main issue in the controversy appears to have been as to whether or not plaintiffs lead a civilized life. People v. Gallagher, 93 N. Y. 438, 45 Am. Rep. 232.

That issue being determined adversely to the plaintiffs, the proceeding should be dismissed.